The next case on today's docket is in the interest of R.F., K.F., G.F., Minors versus Richard F. Appellant. We have Brian Kibler for the appellant, and we have Kelly Stacy for the appellee. You may begin, Mr. Kibler. Counsel, may it please the Court, my name is Brian Kibler, and I am the Court of Appellant Attorney for the Respondent Father, Richard F., in this appeal from the Circuit Court of Eppingham County. In this case, the Circuit Court's decision to terminate the criminal rights of the Respondent Father in regards to the minor child, R.F., that decision should be reversed for two basic reasons. First, the Circuit Court abused its discretion when it denied the Respondent Father's request for an in-camera interview of the child. And second, the Circuit Court erred when it found it to be in the best interest of the minor child, determining the parental rights of the Respondent Father, Richard F. In regards to the issue pertaining to the in-camera interview, my client, Richard F., makes the request for the in-camera interview. The Circuit Court denies that request. And in doing so, the Court clearly abused its discretion. This is a parental termination case. You have a nine-year-old child. It's not a newborn babe that's never seen any of its parents before. It's a nine-year-old child that has memories, reflections of his father and of his other siblings. And we're going to terminate his right to see his father, terminate his legal ability to grow up with his siblings. We're going to make that decision without getting any input from that nine-year-old child. Now, I know often attorneys will sit around and, you know, argue what's the benefit of an in-camera interview. I understand that. But what we're talking about is the most monumental, most important decision that's ever going to be made in the life of this nine-year-old child. It's the child that's known this guy to be his father for nine years of his life, and we're not even going to ask for his input. That in and of itself shows that the Court abused its discretion. Now, you also combine the fact that under the juvenile statute, there's a rebuttal presumption that children are competent to give testimony. You combine that with the fact that also the Court clearly abused its discretion in denying the in-camera interview request. And also, Your Honor, the Court abused its discretion in denying the in-camera interview request because we had different testimony and different evidence produced at trial as to what the intentions were regarding what the child wanted to do. There was also a difference in the evidence produced at trial regarding, you know, what was the nature of the bond between the father and the child. We had different testimony from both sides. And so an in-camera interview might have been beneficial and important for the Court to conduct to see really what was the truth. In the case presented by the State, they had their expert who did a bonding assessment that said there was pretty much no bond at all between the minor child and the father. Also, the State produced a trial testimony from the foster mother, who was also attempting to adopt the child. The foster mom, who wants to adopt, gets up there and goes, you know what, the child has said he loves living with us and he wants to be a part of our family. But then on the other hand, during the respondent father's case in chief, he presents evidence that, you know what, the child has told him, the respondent father, Richard F., that, you know what, he wants to continue to have a relationship with his father. Also, there's a bonding assessment done by the defendant's expert that shows that, you know, it might not be the greatest bond between the child and the father, but that bonding assessment still came back saying, you know what, there is something, there is some connection between the child and the respondent father, Richard F. So what we have here is a case where we're making the most important decision in this kid's life. We have conflicting testimony and evidence presented at trial, and yet the court will not grant a simple basic request for an in-camera interview. Combine all those factors together, it's clear that the circuit court abused its discretion when it failed to conduct that in-camera interview. Are you basically saying that whenever you have a child of that age, you have essentially a right, or the court always abuses its discretion when it denies it? Not necessarily. I mean, there were factors that were given for the denial, correct? There were, there were, Your Honor, and I'm not saying every time an in-camera interview request is made, it has to be granted, but this is a parental termination case. This isn't a simple, you know, divorce case where we're determining who the kid's going to live with the majority of the time. The kid's still going to have a relationship with both parents. This is a termination case where we're just completely severing the legal ties between the parent and the child. So I think in a case where you have a 9-year-old, you're going to determine whether that 9-year-old can ever see his father again. You're going to make that determination. If a request is made by a parent, I think the court pretty much should almost always do it when you have a 9-year-old in a termination case. I mean, you know, if it's a, you know, if we're in an adjudicatory stage under the Juvenile Act, maybe that's not, maybe the court doesn't have to grant it. But under these specific facts where you're talking about completely terminating a child, a 9-year-old child who's grown up knowing this guy to be his father, you're going to deny that child's, you know, input into making this important decision. That is an abuse of discretion, Your Honor. Now, had the court conducted the in-camera interview, I think the court probably would have had a better idea of, you know, which side's evidence was more true than not. I mean, you have a bonding expert for the state saying there's no bond. You have the expert for the respondent father saying, look, there is a relationship between the father and the son. So you have two separate competing kind of ideas. And so an in-camera interview might have been helpful for the court in making that determination. And if the court finds that the court did abuse its discretion, respondent father respectfully asked that this court remanded the thing back to the trial court to determine, or to conduct this in-camera interview. So that's the first reason why respondent father believes that the opinion of the circuit court was wrong. The second reason why respondent father Richard F. believes that the circuit court erred in his decision is the fact that the decision to terminate the parental rights under the best interest standard was against the manifest way of the evidence. In fact, the evidence supports the conclusion that parental rights should not be terminated. You have a 9-year-old child. He's out there. I think there was evidence presented that in his foster house, he keeps pictures of his family. It's clear that there is some sort of relationship between respondent father and the child. And based off the best interest factor of the child's background and ties and sense of attachment and the child's identity, those factors under the best interest determination show that respondent father's rights should not have been terminated. There was evidence presented that the child loved his father. They had some sort of relationship. He kept pictures of respondent father and all his other siblings in a box in the foster house. So it's clear that the child has affection for the respondent father. It's clear that there is some sort of love relationship between the respondent father and the 9-year-old. So based off, you know, those pieces of evidence presented, it's clear that it would be in the best interest of this minor child to not terminate the parental rights. I mean, this was, you know, previously before the court, the father had admitted he was unfit. Just because you're unfit does not mean it's in the best interest of a child to terminate the rights. You know, sure, the respondent father, you know, is not father of the year. He's not going to win any contest like that. But the fact of the matter remains, it's not about the father when it comes to best interest. It's about what the child wants, what the child needs. And here we have a child who loves his father and determinates a relationship between him and his dad. There's no way that that could be in the best interest of the minor child. And the other reason why it was against the manifest way to the evidence, and the other reason why the circuit court erred when it determined that it would be in the best interest to terminate parental rights, the other mistake the court made was the respondent father took the necessary steps to rehabilitate himself. Back at the unfitness part of this bifurcated proceeding, Judge Cody at the time, when he made his decision, when the agreed order of unfitness was put on the record, Judge Cody had that interesting exchange with the respondent father. Judge Cody essentially said, you do these things, and there's going to be pretty much no way that the state's going to be able to find that it would be in the best interest to terminate parental rights. And the things that were outlined for respondent father to do were such things as attend AA, abstain from drugs and alcohol, get a stable living environment. And during the respondent father's case-in-chief, he presented evidence that he did those things. He attended AA. He had a job out in Nevada. In other words, the respondent father had taken the necessary steps to rehabilitate himself. But didn't he fail along the way and come in, allegedly had consumed alcoholic liquor on a visitation? Yes, he did. That was the evidence presented. And I think he was clearly wrong there, but I think in the overall scheme of things, the respondent father presented evidence that showed he'd done pretty much most of the things that were outlined for him. Well, attending AA and doing something about it might be two different things. And you just mentioned that he only attended AA. Which he did. But did it work? I don't know. I really don't know, Your Honor. But essentially, the respondent father had completed the goals outlined by the court. Judge Cody gave him a list, and the father substantially complied is what we believe the evidence showed. And because the father substantially complied with the goals outlined by Judge Cody, there's no way that the court could have determined that it would be in the best interest to terminate. So based off those factors, Your Honor, the circuit court clearly erred when it determined it to be in the best interest to terminate the parental rights of Richard F. He had done the things necessary to create a stable environment, so it was obviously in the best interest of the minor child for him to continue to have a relationship with his father. For those reasons, Your Honor, we feel that the decision of the circuit court should be reversed. We feel that if this court finds that it would be in the best interest, or if this court finds that the circuit court erred, we respectfully request that this court enter an order finding that it was not in the best interest to terminate parental rights and remand the case back to Effingham County. Thank you. Thank you, Mr. Kibler. You'll have opportunity for rebuttal. Ms. Stacy, you may proceed. Thank you, Your Honors. Counsel, may it please the court, the respondent raises two issues on the field. First is that the court erred in terminating his parental rights because he believes he and the child have a bond, and he also believes he complied with the order of the court, especially with regard to becoming sober. His second issue on appeal is that the court abused his discretion when it denied his request to have the minor child, the 9-year-old child, interviewed by the court. I realize the respondent presented those in reversal order today, but I believe by way of background, it's going to be important for me to reverse those if the court will indulge me. In this case, the circuit court properly terminated the respondent's parental rights through a bifurcated proceeding. It allowed the respondent, who admitted unfitness at the first stage of the proceedings, to give him more time to comply with the court order, to get his life together, and to comply with the terms of the service plan. And at the hearing on the motion to terminate the parental rights, the court properly found that it was in the best interest of the minor that respondent's parental rights be terminated. At that hearing, the state proved by preponderance of the evidence that the respondent's rights should be terminated. Counsel discusses the bonding assessments that were done in this case. The state respectfully disagrees with what those bonding assessments show. There was a bonding assessment done at the request of the state, and another one done at the respondent's request. Neither of those assessments recommended that the respondent be reunited with his son. And the respondent's own evaluator noted that the children had been abused in the past, and they needed nurturing and support to overcome it. His evaluator clearly indicated that she did not feel the respondent showed consistent bonding and nurturing interactions with his children, although he tried. It is no wonder the bond was severed between the respondent and the child, because he was the one who initially abused the children. The record shows he put the children aged five and six outside, home alone in the dark. He locked them in the garage and shut them in the closet several times a week. He was also indicated for leaving bruises on the buttocks of two of the children. Dr. Fry, who was the state's evaluator, observed a visit between the respondent and the children that she characterized as extremely painful to observe. His own evaluator even noted that it was difficult for the respondent to maintain a bond with his children when he deliberately moved out of the state of Illinois, which is where the children were located and where he was when the case first began, to first move to California and then move to Nevada. The minor child in this case resides with a family interested in adopting him. His placement is a warm and loving environment. He's involved in community activities. He attends private school and attends church. He was involved in the community production of Beauty and the Beast. He feels very affectionate toward his foster mother. He does well in school, despite being diagnosed with attention deficit disorder and oppositional defiant disorder. His foster family provides him with love and security, a place where he need not be afraid, and that's in contrast to the abuse he suffered when he lived with a respondent. The respondent has a prior history of alcohol abuse. He had an indicated report in 1988 when he cared for RF while intoxicated. He received a DUI in the past and had a prior indicated report for molesting two children who were the children of RF's mother. The respondent maintains he substantially complied with the order, that he maintained sobriety, arguing, he attended some counseling, attended some AA meetings, and even had some lengthy periods of sobriety. The record shows, however, that he failed to comply with the terms of the court order. Your Honor alluded to the supervised visit back in March of this year. The respondent showed up under the influence of alcohol. His hands were unsteady. His speech was slurred. His eyes were glazed. He admitted he had been drinking, although he only admitted to consuming three beers. A worker at the DCFS office asked a state trooper to intervene and talk to the respondent. The respondent became red-faced and shouted, eventually telling the trooper to, quote, get fucked. He demanded that the trooper arrest him, and the trooper testified that the respondent smelled like beer and hard liquor. Rather than fully complying with the court's order that he refrain from alcohol, the respondent minimizes his alcohol abuse by arguing that he substantially complied with sobriety. He told Dr. Fry in his interview that he had a good career with alcohol. He admitted he was a binge drinker who started out with beer and graduated to Jose Cuervo. He also told Dr. Fry, and Dr. Fry found out through investigation, that a period of seven weeks went by where the respondent had no contact with his children at all. And the last supervised visit that the children had with the respondent indicates that his issues with alcohol remained unresolved. The circuit court properly terminated the respondent's parental rights to make way for RF to be adopted. There is a family available for adoption who wish to adopt RF, and RF wanted to be adopted. The last issue remaining is that the respondent's issue that the circuit court earned in denying his request to compel RF to be interviewed by the court. The standard on this issue is abuse of discretion. It's the most deferential standard there is. And in this case, the court properly declined the respondent's request. Why was it proper to decline the respondent's request? Because the issues of RF, the wishes of RF, were already made known to the court. The guardian ad litem presented evidence that after each time RF saw his father, his behavior spiraled out of control. Two times after visits, RF had to be hospitalized. The circuit court found that requiring him to appear at that hearing would be detrimental to his own best interest. Hospitalized for reasons, psychological reasons or physical? Apparently these were psychological reasons. The behaviors got worse and worse. The foster mother took specialized training in how to deal with children with some psychological disorders. That's where he's been placed. Absent visits from the father, he didn't have these types of behaviors. He had behaviors obviously that had to be addressed, but there were nothing like the behaviors that happened after he had visits with his father. The circuit court asked the respondent's father, why is it that you want to have your nine-year-old son come in here and testify? Mind you, this is the same father who had abused RF, who's saying, now you've got to come in here and tell this court in front of me what it is you want to have done. The sole reason he gave was so that RF's wishes could be made known to the court. Is that the only way that could have happened? No, and it's not the way it happened in this case. Even without RF appearing, his wishes were presented to the court. His wishes were expressed through his guardian ad litem. His wishes were expressed because he made his own drawings that he presented to the court. Those were admitted into evidence. One drawing was a picture of himself weeping with the words written, Dear Dad, I'm upset because you were drinking, written right next to the figure of himself. RF also wrote a letter to the judge indicating he did not want to see his dad anymore and that he wanted to live with his foster family. There's not a lot of case law on the request for an interview of a minor child. One case that I did find was a third district case that came out this year. And in that case, the third district appellate court commented that in that particular case, the record indicates that the trial court's decision to exclude the child from testifying was based upon evidence that requiring the child to testify would be detrimental to his best interests. We can only imagine the stress and pressure placed on children that are requested to testify in this setting. The impact of which will undoubtedly affect them long term. We simply cannot know the detrimental effects caused by placing a child in such a situation. We know RF did not want to see his dad again, especially under those stressful circumstances of appearing in court. The trial judge did not abuse her discretion in denying that request for the mandatory interview, especially given the fact that the very last encounter that the two had was RF realizing that his dad was under the influence of alcohol. It's plain from the record, he knew that his dad showed up at that visit under the influence of alcohol. The best interest of RF is paramount in this case. The respondent discusses the weighty issue of terminating parental rights, and it is a weighty issue. And it is an issue that this court, the circuit court, weighed out and analyzed, but when it comes down to it, that's not the most important issue, is whether the respondent feels he has some kind of bond still with his child. I don't doubt that he does. The issue is what's best for RF. He deserves permanency, he deserves concurrent planning, that if respondent could not get his act together, somebody was going to love him and take care of him. He was in care from mid-2006 to mid-2010. That's four years. Four years is long enough to get him to stay sober. The people respectfully request this court affirm the trial court's order terminating the respondent's parental rights and affirm the order authorizing the appointment of the guardian to consent to adoption. Thank you, Your Honor. Thank you, Ms. Stacy. Mr. Kibler, rebuttal. Thank you. In regards to the best interest of the child, the state presents evidence that the foster family over there in Edwardsville provide a better, stable environment. That's true. They have a more conventional way of life. Their people have never been in trouble. Some of these issues are true. But determining who would provide the best environment for the child to live out permanently is not the only consideration in determining best interest in a termination case. Another thing that the court needs to consider are where are the family ties at. And the evidence shows that there is some ties between the child and his biological father. Because of those reasons, the circuit court erred when it terminated parental rights because it is clear that it would not be in the best interest of this child to sever his legal relationship with his biological father and also by terminating the relationship with the biological father, probably also shutting off his relationship in life with his other siblings. So for those reasons, Your Honor, the circuit court erred when it found it to be in the best interest to terminate. Thank you for your time. Thank you, Mr. Kibler. Thank you both for your arguments and briefs. We'll take the matter-